FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff - Appellee*, v. TAIRAN SHI, *Defendant - Appellant*. | No. 24-1969 D.C. No. 2:20-cr-00621-AB-3 OPINION |
| UNITED STATES OF AMERICA, *Plaintiff - Appellee*, v. BLADE BAI, AKA Tian Bai, AKA Dabai, AKA Balde Bai, AKA Bai Tim, *Defendant - Appellant*. | No. 24-2054 D.C. No. 2:20-cr-00621-AB-1 |
| UNITED STATES OF AMERICA, *Plaintiff - Appellee*, | No. 24-2136 D.C. No. 2:20-cr-00621- |

|                                    | AB-2 |
| v.                                 |      |
| BOWEN HU, AKA Hukeer,              |      |
| *Defendant - Appellant.*           |      |

Appeal from the United States District Court
for the Central District of California
André Birotte, Jr., District Judge, Presiding

Argued and Submitted February 11, 2026
Submission Vacated April 13, 2026
Resubmitted July 2, 2026
Pasadena, California

Filed July 2, 2026

Before: Richard C. Tallman, Lawrence VanDyke, and Eric
C. Tung, Circuit Judges.

Opinion by Judge Tallman;
Partial Concurrence by Judge Tung

# SUMMARY[*]

## Criminal Law

The panel affirmed in part and vacated in part the sentences imposed on Defendants Blade Bai, Bowen Hu, and Tairan Shi following their convictions for offenses arising from their participation in a sophisticated scheme to launder Target gift cards purchased by telephone-scam victims; and remanded for a limited resentencing.

The panel held that the district court did not err with respect to its calculation of loss amount for the base offense level determination.

- Rejecting Defendants' contention that, as a matter of law, the intended loss amount may not be included in the value of the laundered funds, the panel concluded that the district court did not err by considering the intended loss as part of the "value of the laundered funds" under U.S.S.G. § 2S1.1(a)(2).

- The panel held that that district court reasonably found that the amount of funds laundered and intended to be laundered totaled approximately $2.5 million.

- The panel held that the district court did not plainly err by not applying a three-level reduction under U.S.S.G. § 2X1.1(b)(2), where Defendants engaged in a money laundering scheme for over a year and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

there was no indication that Defendants intended to stop their unlawful activities until Bai was arrested.

Reviewing de novo, the panel held that the district court improperly imposed a two-level enhancement under U.S.S.G. § 2S1.1(b)(3) for sophisticated laundering, where it applied U.S.S.G. § 2S1.1(b)(2)(C) (four-level increase if (a)(2) applies and the defendant was in the business of laundering funds) but did not apply U.S.S.G. § 2S1.1(2)(b)(B) (two-level increase if the defendant was convicted under 18 U.S.C. § 1956). Given the plain language and structure of U.S.S.G. § 2S1.1, a district court must actually apply § 2S1.1(b)(2)(B) before a defendant can be subject to (b)(3). It is not enough that a defendant was convicted under § 1956. This error requires remand for the limited purpose of adjusting the guideline computation and resentencing; a plenary resentencing is not required.

The panel held that the district court did not abuse its discretion in applying to Hu and Shi a three-level manager/supervisor enhancement under U.S.S.G. § 3B1.1(b).

The panel held that the district court did not abuse its discretion in denying Shi a two-level downward minor-participant adjustment under U.S.S.G. § 3B1.2. Regardless of whether an aggravated enhancement precludes a mitigating-role adjustment, the record supports a finding that Shi was "not substantially less culpable than the average participant." § 3B1.2, cmt. n.3(A).

Judge Tung concurred in part. He wrote separately to express his views on the mitigating-role adjustment. He agreed with the panel that the district court did not abuse its discretion in declining to apply the adjustment for Shi. He would apply the plain language and structure of the

Guidelines—without resort to the commentary—to hold that application of the aggravating role precludes application of a mitigating role adjustment in this case.

## COUNSEL

Meredith B. Healy (argued) and Wei Xiang, Trial Attorneys; Lorinda I. Laryea, Chief, Fraud Section; Todd Blanche, Acting Attorney General; United States Department of Justice, Washington, D.C.; Daniel G. Boyle and Monica E. Tait, Assistant United States Attorneys; Lisa K. Hsiao, Acting Director, Consumer Protection Branch; Christina T. Shay and Lindsey G. Dotson, Assistant United States Attorneys, Chiefs, Criminal Division; Jennifer L. Waier, Chief Assistant United States Attorney, Chief, Criminal Division; Bilal A. Essayli, First Assistant United States Attorney; Office of the United States Attorney, United States Department of Justice, Los Angeles, California; for Plaintiff-Appellee.

W. Miles Pope (argued), Goddard Pope PLLC, Boise, Idaho; Carlton F. Gunn (argued), Law Office of Carlton F. Gunn, Glendale, California; Davina T. Chen (argued), Law Office of Davina T. Chen, Los Angeles, California; Janet E. Hong, The Hong Firm APLC, Long Beach, California; Jennifer L. Ng, South Pasadena, California; for Defendants-Appellants.

**OPINION**

TALLMAN, Circuit Judge:

Over the course of a year, Defendants Blade Bai, Bowen Hu, and Tairan Shi (Defendants) participated in a sophisticated scheme to launder Target gift cards purchased by telephone-scam victims. The jury convicted Defendants of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 1). The jury also convicted Bai of conspiracy to commit money laundering while under release in violation of 18 U.S.C. §§ 1956(h) and 3147 (Count 2).[1] Defendants appeal their sentences, challenging the district court's calculation of the loss amount, application of the sophisticated laundering enhancement, and application of the aggravated and minor role adjustments. For the reasons below, we affirm as to the calculation of the loss amount and role adjustments but reverse as to the sophisticated laundering enhancement.

**I**

When customers purchase Target gift cards, they pay Target the card's face value, and Target enters that amount on an electronic ledger. Customers can access that amount by providing to a cashier a physical gift card encoded with the information when making a purchase. If a customer does not have the physical card, they can spend the money on the card through the Target mobile application or website by providing the card number and its unique access code instead.

---

[1] We affirm the convictions in a concurrently filed memorandum disposition.

Between June 2019 and November 2020, a criminal organization in China called Magic Lamp sent Defendants fraudulently obtained Target gift card numbers and access codes via an encrypted text messaging application called WeChat. Magic Lamp obtained these numbers and codes from overseas scammers who defrauded victims into purchasing the cards and then giving the numbers and codes to the scammers.

On receipt of the card information, Defendants would quickly have "runners" use the numbers and access codes at Target stores. By using the cards rapidly, Defendants and their runners could unload the value from the card before Target could freeze the cards and recoup the value. The runners typically would purchase high-value electronics that could be resold or make a small purchase and move the balance to a new gift card. Bai would resell the merchandise purchased by the runners at his retail store for below market price but at a price higher than what he paid Magic Lamp for the gift cards. Defendants would then send the funds obtained, minus a cut, back to Magic Lamp to "pay" for the gift cards.

Bai was arrested in November 2020 for engaging in this scheme and released on bond the same day. Four days later, Bai messaged one of his partners seeking to liquidate another $30,000 in stolen physical Target gift cards. Bai then worked with his partner to sell the stolen cards to a third party.

The operative indictment, filed in February 2022, charged Defendants in the overall conspiracy in Count 1 and Bai with the post-arrest conspiracy in Count 2. The trial lasted over two weeks and included testimony from 27 witnesses. The jury convicted all Defendants on the money

laundering conspiracy charged under Count 1 and convicted Bai alone on the money laundering conspiracy charged under Count 2.

At sentencing, the district court found the Presentence Reports (PSR) prepared by the Probation Officer for each of the Defendants accurate and correct, and so adopted them as the court's factual findings and computation of the United States Sentencing Guidelines (U.S.S.G. or guidelines) advisory range prior to departures.

The district court calculated a base offense level of 24 for each of the Defendants, which included 8 plus 16 levels because the amount of laundered funds was between $1.5 and $3.5 million. For Bai, the district court applied a four-level enhancement for being in the business of laundering funds, a two-level enhancement for engaging in sophisticated money laundering, a four-level enhancement for being an organizer or leader of a criminal activity, and a three-level enhancement for obstruction of justice based on his post-arrest actions. With a total offense level of 37 and a criminal history category of I, the advisory guideline range was 210–262 months. The district court imposed a 180-month sentence, comprising a 168-month concurrent sentence on Counts 1 and 2, and 12 consecutive months for the 18 U.S.C. § 3147 enhancement on Count 2.

For Hu and Shi, the district court applied a four-level enhancement for being in the business of laundering funds, a two-level enhancement for engaging in sophisticated laundering, and a three-level enhancement for being managers or supervisors in the conspiracy. With a total offense level of 33 and a criminal history category of I, the advisory guideline range for both Hu and Shi was 135–168

months. Hu received a 120-month sentence, and Shi received a 96-month sentence.

This appeal followed.

## II

We review a "district court's interpretation of the [guidelines] de novo," its "application of the [guidelines] to the facts for abuse of discretion," and its "factual findings for clear error." *United States v. Kahre*, 737 F.3d 554, 565 (9th Cir. 2013) (citation omitted). However, "[p]lain error review applies to sentencing objections first raised on appeal." *United States v. Herrera*, 974 F.3d 1040, 1045 (9th Cir. 2020).

## III

### A

We first consider Defendants' claims regarding the district court's calculation of loss amount for the base offense level determination. Defendants contend that (1) as a matter of law the intended loss amount may not be included in the value of laundered funds, (2) the district court improperly calculated the amount of laundered funds, and (3) if the loss amount calculation was not error, the district court should have applied a three-level reduction under U.S.S.G. § 2X1.1(b)(2).[2] For the reasons discussed below, we reject these arguments and conclude that the district court properly applied and calculated the loss amount.

---

[2] All further section references are to the guidelines unless otherwise noted.

**1**

To determine the offense level, the district court applied § 2X1.1, which is the starting point for sentencing calculations of offenses involving attempts, solicitations, and conspiracies not already covered by specific offense guidelines.   Under § 2X1.1(a), courts calculate the base offense level by using "[t]he base offense level from the guideline for the substantive offense, plus any *adjustments* from such guideline for *any intended offense conduct* that can be established with reasonable certainty."   (Emphases added).   The "substantive offense" "means the offense that the defendant was convicted of soliciting, attempting, or conspiring to commit."   *Id.* cmt. n.2.

Accordingly, the district court turned to § 2S1.1, the money laundering guideline.   Section 2S1.1(a)(2) provides for a base offense level of "8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds."   The district court found that the value of the laundered funds conspired to be laundered exceeded $1.5 million but was less than $3.5 million.   It thus increased Defendants' base offense level by 16 pursuant to § 2B1.1(b)(1)(I) for a total level of 24.

Defendants contend this analysis was error, arguing that the term "adjustments" as used in § 2X1.1(a) refers only to specific offense characteristics under § 2S1.1(b), and does not apply to alter the base offense level.   Thus, under Defendants' theory, the district court only considers intended loss when looking at specific offense characteristics.

*United States v. Simon*, 858 F.3d 1289 (9th Cir. 2017) (en banc), counsels against Defendants' interpretation.

There, the defendant was convicted of conspiracy to commit robbery under the Hobbs Act, and "we called the case en banc to clarify how to determine when another guidelines section 'expressly' covers an inchoate offense." *Id.* at 1290. In doing so, we explained:

> Under § 2X1.1(a), the court begins with "[t]he base offense level from the guideline for the substantive offense." Thus, a court calculating the sentence for "attempt to commit felony X" starts with the base offense level in the Guidelines section for "felony X." Section 2X1.1(a) directs the sentencing court to draw any upward adjustments "from such guideline"—that is, the Guidelines section for the substantive offense—and apply those adjustments for "any *intended offense conduct that can be established with reasonable certainty*" (emphasis added); *see also id.* cmt. n.2 (noting that the relevant offense characteristics for sentencing purposes "are those that are determined to have been specifically intended or actually occurred"). Therefore, where § 2X1.1(a) applies, defendants convicted for an inchoate felony may receive sentencing enhancements as if they had completed the felony, even if they only intended the conduct. This can have a dramatic impact on the sentences defendants receive.

*Id.* at 1291–92.

Given this explanation, we conclude that the district court did not err by considering the intended loss as part of the "value of the laundered funds" under § 2S1.1(a)(2).[3] Defendants' "intended conduct is a proper basis for the enhancements the district court applied," including an "enhancement[] for loss amount . . . based on conduct that [they] intended but did not carry out." *Id.* at 1298.

Defendants contend that *Simon* is distinguishable because the underlying offense implicated § 2B3.1, which uses adjustments—not an altered base offense level—to account for loss. We think this too fine a distinction. Conspiracy to commit a crime is separate and distinct from the underlying substantive offense. Thus, sentencing for conspiracy defendants is driven by the scope of their unlawful agreement, not the scope of their completed conduct. *See United States v. Castillo*, 69 F.4th 648, 652 (9th Cir. 2023) ("Conspiracy is an inchoate offense that is separate and independent from the crime that is the subject of the conspiracy."). Furthermore, "[s]ection 2S1.1 measures the harm to society that the money laundering causes to law enforcement's efforts to detect the use and production of ill-gotten gains." *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1355 (D.C. Cir. 2002) (quoting *United States v. Allen*, 76 F.3d 1348, 1369 (5th Cir. 1996)). It therefore makes sense for the sentence to account

---

[3] This approach is also consistent with the application notes for § 2X1.1, which provide the example that "[i]n an attempted theft, the value of the items that the defendant attempted to steal would be considered." *Id.* cmt. n.2; *accord* 18 U.S.C. § 1956(h) ("Any person who conspires to commit any offense defined in this section or section 1957 *shall be subject to the same penalties as those prescribed for the offense* the commission of which was the object of the conspiracy." (emphasis added)).

for both the funds actually laundered and the funds intended to be laundered. Thus, it was appropriate for the district court to consider the value of funds Defendants intended to launder when calculating their base offense level.

## 2

Defendants also argue that even if the district court did not err by considering the intended loss in its base offense level determination, it nevertheless improperly calculated the amount of funds laundered. At sentencing, the evidence showed, and the district court agreed, that the total value of laundered funds came to $2.48 million. Defendants argue that the district court wrongfully assumed that every single card number was valued at $500, constituted proceeds of a specified unlawful activity, and was successfully laundered.

We see no basis to disturb the district court's findings on review. The Government presented evidence extracted from Defendants' WeChat messages showing that over the course of 12 months, Defendants received 5,256 unique gift card numbers from Magic Lamp. After further automated extraction and manual review, the Government calculated that the average value of each card was $472. Thus, the total value came to $2.48 million.

Defendants' messages also showed that they did not distinguish between any of the card numbers received, instead applying the same techniques to every card used and rushing to spend them all. Further, Defendants knew and discussed how to avoid being caught by Target and the police with respect to their gift cards categorically. Based on this evidence, the district court reasonably found that the amount of funds laundered and intended to be laundered totaled approximately $2.5 million.

**3**

Finally, Defendants alternatively assert that if the district court properly calculated their base offense level, it should have also granted them a three-level reduction under § 2X1.1(b)(2). Because Defendants did not raise this issue below, plain error review applies. *See United States v. Grissom*, 525 F.3d 691, 694 (9th Cir. 2008); *Herrera*, 974 F.3d at 1045.

Section 2X1.1(b)(2) provides for a three-level decrease "unless the defendant or a coconspirator completed all the acts the conspirators believed necessary on their part for successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control." No reduction is warranted if the "substantive offense was substantially completed or was interrupted or prevented on the verge of completion by the intercession of law enforcement authorities." *United States v. Yellowe*, 24 F.3d 1110, 1113 (9th Cir. 1994) (quoting § 2X1.1, cmt. backg'd.).

The district court did not plainly err by not applying this three-level reduction. The evidence showed that Defendants engaged in a money laundering scheme for over a year. There is no indication that they intended to stop their unlawful activities until Bai was arrested in November 2020. And the jury found in Count 2 that even the first arrest did not stop Bai from continuing to offend. Further, Magic Lamp continually supplied Defendants with cards for the duration of the conspiracy, supporting the inference that the cards they transacted were successfully laundered.

In sum, we hold that the district court did not err with respect to its calculation of loss amount.

## B

Defendants next challenge the two-level enhancement for sophisticated laundering under § 2S1.1(b)(3). Section 2S1.1 directs base offense level calculations and adjustments for specific offense characteristics as follows:

(a) Base Offense Level:

(1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or

(2) 8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

(b) Specific Offense Characteristics

(1) If (A) subsection (a)(2) applies; and (B) the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical; (ii) a crime of

violence; or (iii) an offense involving firearms, explosives, national security, or the sexual exploitation of a minor, increase by 6 levels.

(2) (Apply the Greatest):

(A) If the defendant was convicted under 18 U.S.C. § 1957, increase by 1 level.

(B) If the defendant was convicted under 18 U.S.C. § 1956, increase by 2 levels.

(C) If (i) subsection (a)(2) applies; and (ii) the defendant was in the business of laundering funds, increase by 4 levels.

(3) If (A) subsection (b)(2)(B) applies; and (B) the offense involved sophisticated laundering, increase by 2 levels.

The district court determined that Defendants were engaged in the business of laundering funds and so applied subsection (b)(2)(C) to increase Defendants' offense level by four. It also applied subsection (b)(3) on the basis that Defendants engaged in sophisticated laundering, which increased the offense level by another two levels. Defendants thus received a six-level total increase under § 2S1.1(b). The issue we must decide is whether subsection (b)(3) requires the district court to have actually imposed the two-level increase under subsection (b)(2)(B), or if it is

enough simply that the defendant was convicted under 18 U.S.C. § 1956.

**1**

As an initial matter, the parties dispute the applicable standard of review. At sentencing, Defendants each objected in writing to the two-level sophisticated laundering enhancement, arguing that the offense did not involve sophisticated laundering. The Government argues that plain error review applies because Defendants did not raise the specific legal issue of whether condition (A) of subsection (b)(3) was satisfied. Defendants respond that "it is claims that are deemed waived or forfeited, not arguments." *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004). They assert that de novo review applies because though their *argument* now includes condition (A) as a basis for why subsection (b)(3) does not apply, their general *claim* that subsection (b)(3) does not apply was raised to the district court.

Defendants have the better argument. In *United States v. Lloyd*, 807 F.3d 1128 (9th Cir. 2015), a defendant preserved a claim that two of his sentences should garner only three points, even though his appellate argument in support of that claim was different from his argument below. *Id.* at 1175. At sentencing, the defendant argued that the two sentences should be treated as a single sentence under § 4A1.2(a)(2), but on appeal he argued that the single revocation of the two sentences should be added to only one sentence under Application Note 11. We held that the latter argument was "an alternative argument to support . . . his consistent claim from the beginning," which was that only three points should be added to his sentence. *Id.* (citation omitted). Likewise, here, Defendants have consistently

claimed that subsection (b)(3)'s two-level increase should not apply. On appeal, they present an additional argument in support of this claim, but the claim remains the same. *See United States v. Hong*, 938 F.3d 1040, 1052 (9th Cir. 2019) (reviewing de novo where defendant contested different elements of a sentencing enhancement on appeal).

The Government relies on *United States v. Hackett*, 123 F.4th 1005 (9th Cir. 2024), in which a defendant's objection to the calculation of intended loss did not preserve a claim that intended loss was a legally impermissible loss measure. But there, the defendant explicitly "accepted the premise" that the commentary's interpretation of loss was a "permissible reading," and then rejected that same premise in his appellate argument. *Id.* at 1011. The same cannot be said of Defendants here.

We therefore review this issue de novo.

**2**

Turning to the merits, we apply "the traditional tools of statutory construction" to interpret the text of the guidelines. *Castillo*, 69 F.4th at 657–58. Accordingly, our analysis begins with the plain language of § 2S1.1 to determine whether a two-level sophisticated laundering enhancement applies in this case.

The plain language of subsection (b)(3) provides that it applies only if both of the following conditions are satisfied: "(A) subsection (b)(2)(B) applies; and (B) the offense involved sophisticated laundering." In turn, subsection (b)(2)(B) is one of three alternative subsections providing for offense level increases under § 2S1.1(b)(2), the greatest of which must be applied. Specific offense characteristics

under Chapter Two are applied in the order listed. § 1B1.1(a)(2).

The district court found that Defendants were engaged in the "business of laundering funds" and therefore applied the four-level increase under subsection (b)(2)(C), the greatest of the three alternatives. And, because subsection (b)(2)(C)'s four-level increase is greater than subsection (b)(2)(B)'s two-level increase, the district court did not apply subsection (b)(2)(B). As a result, based on the guideline's plain language, the first condition for applying subsection (b)(3) was not satisfied.

The Government argues that a subsection can *apply* to an offense without actually being *applied*. In other words, subsection (b)(2)(B) *applies*—Defendants were all convicted under 18 U.S.C. § 1956—it was just not *used* (that is, two levels were not added for the fact of conviction) because the greater enhancement in (b)(2)(C) also applies and was used instead. But if the Sentencing Commission intended (b)(3) to apply *any* time a defendant was convicted under 18 U.S.C. § 1956, then Condition A of (b)(3) should read: "If (A) the defendant was convicted under 18 U.S.C. § 1956." Instead, as written, the plain language of (b)(3) indicates Condition A is only satisfied if (b)(2)(B) "applies." We read this to mean that (b)(2)(B) "applies" only if the district court increased the offense level by two based on that subsection. *See United States v. Calderon Espinosa*, 569 F.3d 1005, 1007 (9th Cir. 2009) ("In interpreting the Sentencing Guidelines, '[t]he plain meaning of unambiguous language in a guideline provision controls.'" (quoting *United States v. Valenzuela*, 495 F.3d 1127, 1133 (9th Cir. 2007))). Moreover, if the Commission wanted subsection (b)(3) to apply in situations where a defendant's offense level was also increased based on being in the

business of laundering funds under (b)(2)(C), it could have written it that way. For example, by having Condition A read: "subsection (b)(2)(B) or (b)(2)(C) applies."

The Government also argues that engaging in the business of laundering and engaging in sophisticated laundering are two different harms, which is reflected by the fact that they have two different and separate enhancements. This argument mistakes the aims of § 2S1.1, which are reflected in its overall structure.

In 2001, the Commission amended this guideline by separating money laundering offenders into two categories. "Direct money launderers" are those who committed the underlying offense and then also laundered the proceeds of their own crime; "third party money launderers" are those who did not commit the underlying offense but laundered related proceeds. *See United States v. Lucena-Rivera*, 750 F.3d 43, 51–52 (1st Cir. 2014); Thomas W. Hutchinson, *et al.*, Fed. Sent. L. & Prac. § 2S1.1 (2026 ed.). Subsection (a)(1) applies to direct money launderers; subsection (a)(2) applies to third-party money launderers.

In accordance with this distinction between types of launderers, the guideline limits the applicability of subsection (b)(2)(C) (business of money laundering) to third-party money launderers.[4] It provides a four-level enhancement for "professional" third-party money launderers who are regularly engaged in "the business of laundering funds," over and above mere ad hoc third-party money launderers. This distinction also explains the function for subsection (b)(3)'s "sophisticated laundering"

---

[4] Under subsection (b)(1), third-party money launderers are subject to a six-level enhancement based on the *source* of the funds.

enhancement, which punishes direct money launderers who take advanced measures to conceal laundering of the proceeds of their own crimes. This results in proportional enhancements for both types of money launderers under subsections (b)(2) and (b)(3): at most the direct money launderer can receive a four-level increase (by application of subsections (b)(2)(B) and (b)(3)), and at most the third-party money launderer can receive a four-level increase (by application of subsection (b)(2)(C)).[5]

Accordingly, the plain language and structure of § 2S1.1 leads us to conclude that a district court must *actually* apply (b)(2)(B) before a defendant can be subject to (b)(3). Because the district court here applied (b)(2)(C), and not (b)(2)(B), it improperly imposed the two-level enhancement under (b)(3) for sophisticated laundering. This error requires that we vacate and remand for the limited purpose of adjusting the guideline computation and resentencing the Defendants. The district court is not required to conduct a plenary resentencing.

## C

Finally, we consider the role adjustments applied to Hu's and Shi's sentences. For the reasons discussed below, we affirm the district court's application of the aggravated role adjustment to Hu and Shi and its decision not to grant Shi a minor role adjustment.

---

[5] Indeed, under the Government's position, the third-party money launderer—who did not commit the underlying offense—would be eligible for a six-level increase, while the more culpable direct money launderer would at most only receive a four-level increase.

**1**

Hu and Shi contend the district court improperly applied a three-level enhancement under § 3B1.1(b) based on its finding that they were managers or supervisors. We see no abuse of discretion here.

Section 3B1.1(b) requires an "increase by 3 levels" "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." To qualify for this enhancement, "a defendant must have managed or supervised one or more other 'participants' in an extensive criminal activity." *United States v. Gagarin*, 950 F.3d 596, 606 (9th Cir. 2020) (quoting *United States v. Gadson*, 763 F.3d 1189, 1222 (9th Cir. 2014)). The manager or supervisor role enhancement does not apply if the defendant and other participant are co-equals, nor does it apply where a defendant's role "is best characterized as 'facilitation' rather than 'organization.'" *United States v. Holden*, 908 F.3d 395, 403 (9th Cir. 2018) (citing *United States v. Whitney*, 673 F.3d 965, 975–76 (9th Cir. 2012)). Instead, there must be evidence "that the defendant exercised some control over others involved in the commission of the offense or was responsible for organizing others for the purpose of carrying out the crime." *Gagarin*, 950 F.3d at 606 (citation modified).

Here, the Government presented evidence that both Hu and Shi exercised control over at least two of the conspiracy's runners, Yan Fu and "Second Sister." In September 2019, Hu and Shi began receiving gift card numbers and access codes directly from Magic Lamp. They then enlisted Fu and Second Sister to spend the gift cards at Target. They directed Fu and Second Sister on how to

quickly spend the cards and required them to provide screen shots of receipts and Target's mobile app showing the card activity. Shi instructed Fu to "hurry up," told her what items to buy and not to buy, and directed her to compare the prices of products. Hu and Shi paid her a gas stipend from their profits, and Shi paid her salary.

Hu and Shi, however, assert that Fu was an independent contractor who did not need guidance and that they did not instruct Second Sister on what to buy. But the evidence above is adequate to support a finding that Hu and Shi acted as managers or supervisors. Hu and Shi propose an alternative interpretation of the evidence, but that is not enough to conclude the district court abused its discretion.

Hu and Shi also compare this case to *Holden*, asserting that, at most, they only "facilitated" the offense. In *Holden*, we overturned a role enhancement under § 3B1.1(c) because the district court expressly determined the two conspirators were "co-equal." 908 F.3d at 402; *id.* at 403 (noting that giving a co-conspirator "instructions for sending investors' funds to accounts [the defendant] controlled" was "best characterized as 'facilitation' rather than 'organization'"). But unlike the district court in *Holden*, here, the district court did not find the participants were co-equals. To the contrary, it stated, "I view these three defendants as completely different than Yan Fu and they're a much higher level at least from the Court's perspective. . . . I view them as much higher in the chain than Yan Fu." The evidence in the record supports this conclusion. *Holden* is therefore distinguishable.

Finally, Hu and Shi argue that the district court improperly determined that § 3B1.1(b) does not require a finding that they exercised control over another criminal

participant.  The record does not reflect that the district court made such a conclusion.  Rather, the transcript shows that the parties focused on the element of control and that the district court contemplated and acknowledged the control element.  The district court also adopted the findings in the PSRs, which included findings that Hu and Shi exercised control over another participant.

Accordingly, we conclude that the district court did not abuse its discretion in its application of the three-level role enhancement under § 3B1.1(b).

## 2

Shi also argues that he should have received a two-level downward adjustment under § 3B1.2 because he was a minor participant in the conspiracy.  Specifically, Shi challenges the district court's conclusion that his aggravated role adjustment precluded him as a matter of law from receiving a mitigating role adjustment.

"We may affirm the district court's sentencing decision on any basis supported by the record."  *United States v. Adkins*, 883 F.3d 1207, 1213 (9th Cir. 2018) (citation modified).   And regardless of whether an aggravated enhancement precludes a mitigating role adjustment, the record supports a finding that Shi was not "substantially less culpable than the average participant."  § 3B1.2, cmt. n.3(A).  Although he may have been less culpable than others, the scheme also included runners even less culpable than Shi.  The district court therefore did not abuse its discretion by not applying the downward mitigating role adjustment to Shi.

\* \* \*

We affirm the district court's calculation of loss amount and its application of the aggravated and minor role

adjustments. However, because the district court misapplied the sophisticated laundering enhancement, we vacate Defendants' sentences and remand for a limited resentencing on a properly calculated guideline range as discussed in part III.B.2. above. At this limited resentencing, the district court is directed to recalculate Defendants' sentences on a closed record in a manner consistent with § 2S1.1(b) as articulated in this opinion.

**AFFIRMED in part, VACATED in part, and REMANDED with instructions.**

---

TUNG, Circuit Judge, concurring in part:

I write separately to express my views on the mitigating-role adjustment. The district court declined to apply that adjustment for Defendant Shi. Today, the panel holds that the district court did not abuse its discretion. I agree. I arrive at that conclusion, however, through a different path.

According to *United States v. Klensch*, 87 F.4th 1159 (9th Cir. 2023), a district court must consider a five-factor test contained in the Guideline commentary on the mitigating-role adjustment.[1] This court in *Klensch* reversed

---

[1] The five factors that the commentary asks courts to consider include: "(i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

the district court's refusal to apply a mitigating-role adjudgment, because the district court's "cursory explanation g[ave] no indication that it considered the required factors or did any comparative analysis of [the defendant's] conduct." *Id.* at 1164. Like the district court in *Klensch*, the district court here gave "no indication" that it considered the factors; indeed, it made no mention of them. Because, like in *Klensch*, the "Government has not argued harmless error," *Klensch* seems to require reversal. *Id*. at 1166.

But *Klensch* is not binding on us here. At the outset, the cases *Klensch* applied are likely no longer good law after *Kisor v. Wilke*, 588 U.S. 558 (2019). *Kisor* cabined the scope of *Auer* deference—which generally (and previously) bound courts to an agency's interpretation of its own regulation—by holding that "a court should not afford [such] deference unless the regulation is genuinely ambiguous." *Id.* at 574. "If uncertainty does not exist," the Court held, "there is no plausible reason for deference." *Id.* at 574–75. And "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction"—including "carefully" considering "the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* at 575 (citations omitted).

This court has adopted *Kisor*'s reasoning in rejecting a district court's deference to Guidelines commentary. *See United States v. Castillo*, 69 F.4th 648 (9th Cir. 2023) ("The more demanding deference standard articulated in *Kisor* applies to Guidelines' commentary."); *see also United States*

---

(v) the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2 cmt. n.3(C).

*v. Dupree*, 57 F.4th 1269, 1275 (11th Cir. 2023) (en banc) ("*Kisor* did not distinguish between an agency's interpretation of its own regulations and the commentary's interpretation of the Guidelines."). In *Castillo*, this court held that the commentary to a Guideline's definition of "controlled substance offense" was not entitled to deference, because in the court's view, the commentary had "improperly expanded" the Guideline's "plain language" definition to include inchoate crimes (*e.g.*, attempt and conspiracy) when the definition only contemplated completed crimes. 69 F.4th at 663 & n.7. *Castillo* acknowledged that the Supreme Court's decision in *Stinson v. United States*, 508 U.S. 36 (1993), might have once required "broad deference" to Guidelines commentary, but *Castillo* concluded that *Kisor* necessarily altered *Stinson*'s rule. *See Castillo*, 69 F.4th at 665–66.

In so concluding, the court in *Castillo* expressly overruled prior panel decisions that held to the contrary in applying *Stinson* deference to Guidelines commentary—because *Kisor* was "intervening higher authority" and "clearly irreconcilable" with those panel decisions. *See Castillo*, 69 F.4th at 656 (citation omitted). And importantly, this court even disregarded panel decisions that were decided *after Kisor* but that relied on that pre-*Kisor* precedent. Such decisions, because they failed to address *Kisor*, were not binding. *See id*. at 657.[2]

---

[2] The Supreme Court recently granted a petition for a writ of certiorari to decide whether *Kisor* or *Stinson* "states the rule for the deference that courts must give the commentary to the Sentencing Guidelines." *Beaird v. United States*, No. 25-5343, 2026 WL 1052007, at \*1 (U.S. Apr. 20, 2026). Given that decision, an alternative course might have been to wait for the Court's decision in *Beaird*. *See, e.g.*, *Navarrete v. Bondi*, 170 F.4th 1214, 1219 (9th Cir. 2026). But a decision pending *Beaird* could

We should take the same approach here.  We should acknowledge *Klensch* and hold that, because it failed to consider *Kisor*, *Klensch* is not binding.  *Klensch* improperly relied on pre-*Kisor* panel decisions that reflexively deferred to the commentary.  And so, as in *Castillo*, we should overrule those decisions (*see, e.g.*, *United States v. Diaz*, 884 F.3d 911, 915–16 (9th Cir. 2018); *United States v. Quintero-Leyva*, 823 F.3d 519, 523–24 (9th Cir. 2016)).  For those post-*Kisor* decisions that *Klensch* incorrectly relied on, we should rule that they (like *Klensch*) are not binding (*see, e.g.*, *United States v. Rodriguez*, 44 F.4th 1229, 1233 (9th Cir. 2022); *United States v. Dominguez-Caicedo*, 40 F.4th 938, 960 (9th Cir. 2022)).

The logic in *Kisor* (as explained in *Castillo*) requires us *not* to defer to (or be bound by) the five-factor test listed in the commentary.  Nor, for that matter, should we defer to the commentary stating that a "minor participant" be "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. n.3(A). Using far plainer language, the Guidelines instruct a decrease by two levels if Shi "was a minor participant" in the criminal activity. *Id*. § 3B1.2(b).  That language is not "genuinely ambiguous" to trigger deference to the commentary.  Shi was not a "minor participant" under any reasonable definition of the term.  "Minor" means "comparatively unimportant" (Merriam-Webster's Collegiate Dict. (11th ed. 2020)) or "[l]esser in importance, rank, or stature" (Am. Heritage College Dict. (3d. 2000)).  None of that describes Shi, who the district court found to have been a "manager or supervisor" in the crime, increasing his offense level by three

last months or even over a year; in the meantime, *Castillo* controls the outcome here, in my view.

under the "Aggravating Role" guideline. *See* U.S.S.G. § 3B1.1(b); ShiPSR 15 ¶ 59; PSR Add. at 3; *see also* 1 ShiER 37 (district court stating the "I do find the presentence report to be accurate"); *id*. at 96 (district court stating "if I haven't made it clear, the arguments that were made with respect to Mr. Shi as it relates to specific offense characteristics I do adopt and agree with").

Put simply, a "manager" or "supervisor"—particularly one who "supervised at least one coconspirator"—is *not* a "minor participant." We need not resort to the commentary to resolve any ambiguity. Indeed, the commentary confuses, rather than clarifies, the matter. As discussed, the commentary announces an ambiguous test—a "minor participant" is one who is "substantially less culpable than the average participant." (But what is "average"? How much is "substantially less culpable"?) To compound the confusion, as mentioned, the commentary sets forth five, non-exhaustive, and open-ended factors that courts must consider. Worse still, the commentary then notes that "[t]he fact that a defendant performs an *essential* or *indispensable* role in the criminal activity is *not* determinative" as to whether a defendant is a "minor" (or for that matter, "minimal") participant. U.S.S.G. § 3B1.2 cmt. n.3(C) (emphases added). That makes little sense: a person who is "essential" or "indispensable" to the crime can hardly be described as "minor" or "minimal."**[3]**

Far simpler (and more correct) would be to apply the plain language and structure of the Guidelines—without resort to the commentary—to hold that application of the

---

[3] For similar reasons, with respect to the other sentencing claims in this case, I do not see a need for the panel to rely on the commentary when we can construe the Guidelines ourselves.

aggravating role precludes the application of a mitigating role in this case.  That provides a sound and principled basis for affirmance.